## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MALIKA ARYANPURE and<br>MITT LARY FAMILY PRACTICE, LLC<br>    Third-Party Plaintiffs,<br><br>v.<br><br>CYNOSURE, LLC,<br><br>    Third-Party Defendant. | Civil Case No. 1:24-CV-11151-DJC |

**AMENDED COMPLAINT AND JURY DEMAND OF THIRD-PARTY PLAINTIFFS**
**MALIKA ARYANPURE, MD, AND MITT LARY FAMILY PRACTICE, LLP,**
**AGAINST THIRD-PARTY DEFENDANT CYNOSURE, LLC**
**(WITH LEAVE TO FILE GRANTED ON AUGUST 16, 2024)**

This action arises out of certain disturbingly aggressive and misleading sales tactics repeatedly used by a sophisticated seller of medical goods, Third-Party Defendant, Cynosure, LLC, to convince an unsuspecting family medicine doctor to purchase a $180,000 machine that, Cynosure claimed, used "revolutionary" and "FDA-cleared" technology to "painlessly" provide "vaginal rejuvenation."

This course of conduct has been perfected and repeated across multiple jurisdictions, impacting hundreds, if not thousands, of medical providers. These tactics greatly exceed the bounds of acceptable product puffery and constitute precisely the type of outrageous conduct that has been found to rise to the level of prohibited unfair and deceptive trade practices under Massachusetts law. Cynosure knew that certain critical factual representations about the product's "magical" qualities were untrue when made, and was further aware that it had no intention of fulfilling other promises concerning post-purchase service deliverables.

The physician targeted in this instance, Third-Party Plaintiff Malika Aryanpure, and the office that she owns and manages, Third-Party Plaintiff Mitt Lary Family Practice, here assert

claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) breach of the implied warranty of merchantability and fitness for a particular purpose, (4) promissory estoppel, (5) fraudulent misrepresentation/deceit, (6) negligent misrepresentation, (7) violation of Massachusetts General Laws Chapter 93A, and (8) unjust enrichment.

## Summary of Procedural and Factual History

The claims of Dr. Aryanpure and her medical practice relate to the 2019 purchase of a "TempSure" cosmetic device, manufactured, marketed, and sold by Cynosure from its Massachusetts base. The device uses radio waves for the purported purpose of effectuating cosmetic changes to skin and underlying tissue, and comes with separately purchased attachments called "Vitalia" and "Envi."

These claims derive from a collection action that was filed against Dr. Aryanpure and Mitt Lary in a California state court in May 2020. The plaintiff lender, Balboa Corporation, voluntarily dismissed that action in May 2023, but then refiled in California federal court days later, still in May 2023. The claims against Third-Party Defendant Cynosure were transferred to this Court in April 2024.

In bringing her claims, Dr. Aryanpure's seek to hold Cynosure accountable for its brazenly unscrupulous business practices. Cynosure misleadingly insisted that Dr. Aryanpure's practice had been "specially selected," but that she had to act quickly to ensure territorial exclusivity. Financing would be provided on "very favorable terms," with manageable monthly payments would not be a problem because the machine would "pay for itself." In any event, the doctor would be free to return the device at any time if things did not work out, so confident was Cynosure in its product.

TempSure Vitalia was described as a miracle application that could "painlessly" provide female patients with a firmer and more lubricated vagina, such that it just one session with the application would "spice up" a patient's sex life.  These representations were made even after the FDA had warned Cynosure that they were engaging in the "deceptive marketing of a dangerous procedure with no proven benefit," a practice that the FDA found to be "egregious." Cynosure and its sales agent made countless additional misrepresentations concerning the device and its capabilities, and the marketing, training, and support services that were to be provided.  Cynosure intended to bestow none of these promised benefits upon purchasers, and Cynosure knew these promises to be false when made.

In fact, Dr. Aryanpure and her practice <u>never</u> profited from the device.  On those few occasions when the practice attempted to use it, patients complained of intense pain before the requisite heat settings were even reached.  In the end, the doctor paid nearly <u>twice</u> the purchase price under the terms of an oppressive financing agreement to resolve claims for non-payment on the defective product.

In sum, Cynosure's course of performance breached express and implied contractual terms, and in actions taken prior to contract formation it willfully and wantonly misrepresented (1) the pre-sale analysis it claimed to have done, (2)  the FDA's support for the product's proposed uses, (3) the "beneficial" nature of the proposed financing, (4) the device's efficacy and pain-free application, (5) the training and marketing support that would be provided, (6) the positive impact that the device would have on Dr. Aryanpure's practice, and (7) the support that would come from Cynosure's parent, Hologic, Inc.

**Parties**

1.      Third-Party Plaintiff Malika Aryanpure ("Dr. Aryanpure") is a Doctor of Medicine residing at all relevant times in the state of Alabama.

2.      Third-Party Plaintiff Mitt Lary Family Practice, LLC ("Mitt Lary"), is a limited liability company organized and existing under Alabama law, with a principal place of business at 4815 Rose Boulevard, Northport, Alabama.  Dr. Aryanpure is Mitt Lary's owner and Medical Director.

3.      Third-Party Defendant Cynosure, LLC ("Cynosure"), is a Delaware corporation with a principal place of business at 5 Carlisle Road, City Westfield, Massachusetts.  At the time that the subject device was marketed and sold to Dr. Aryanpure, Cynosure was known as "Cynosure, Inc.," and was a wholly owned subsidiary of Hologic, Inc., a Delaware company with a principal place of business at 250 Campus Drive, Marlborough, Massachusetts.  Hologic and Cynosure have also represented Cynosure was represented as being a "division" of Hologic or, alternatively, a "Hologic company."

**Jurisdiction & Venue**

4.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between the plaintiffs and the defendant, and the amount in controversy is more than $75,000.

5.      Personal jurisdiction over Cynosure exists because it has consented to suit in the United States District Court for the District of Massachusetts, and because it has its principal place of business in Middlesex County, Massachusetts.

6.      Venue is proper because Cynosure consented to suit in the United States District Court for the District of Massachusetts, and because, under 28 U.S.C. Section 1391(b)(1), Cynosure is a resident of the Judicial District.

**Relevant Procedural Background**

7.      Mitt Lary and Dr. Aryanpure purchased the device and signed a related financing agreement in August, 2019.

8.      In May 2020, less than nine months later, and in the midst of the pandemic, the lender, Balboa Corporation, sued Alabama residents Dr. Aryanpure and Mitt Lary in a California state court.  Balboa alleged breach of contract for failure to maintain payments under the financing agreement.  [*Balboa Capital Corporation v. Mitt Lary Family Practice LLC, and Malika Aryanpure, and Does 1 through 10*, Superior Court California, County of Orange, Case No. 30-2020-01146549-CU-CL-NJC].

9.      Dr. Aryanpure and Mitt Lary Answered, and, in May 2023, moved to amend their Answer, adding counterclaims against plaintiff Balboa and third-party claims against Cynosure and Hologic.

10.     Balboa did not oppose the motion to amend, but instead, several days later, on May 16, 2023, voluntarily dismissed the *state court* complaint.

11.     Ten days after that, on May 26, 2023, Balboa refiled its complaint in a California *federal court*.  [Balboa Capital Corporation v. Mitt Lary Family Practice LLC, and Malika Aryanpure, and Does 1 through 10, U.S.D.C. for the Central District of California, Southern Division, Case No. 1:2024cv11151].

12.     Balboa provided no explanation for its delayed decision to forum shop.

13.     After filing, a procedural dispute arose concerning the federal court's lack of jurisdiction over Balboa's claims.  That dispute was resolved in October 2023, when Balboa agreed to dismiss 10 unnamed "Doe" defendants from its refiled complaint.  [Court Order of Oct. 12, 2023, Dckt. 22].

14.     Dr. Aryanpure and Mitt Lary then filed their Answer and Third-Party Complaint, again naming Cynosure and Hologic as third-party defendants.  [November 2, 2023, Dckt. 23, and as amended, Dckts. 56 and 71].

15.     Balboa twice moved to dismiss the counterclaims that Dr. Aryanpure had asserted against it.  Balboa argued in part that, with respect to fraudulent statements allegedly made at the time of sale by Cynosure, there was no agency relationship between Dr. Aryanpure and Balboa, who claimed to be no more than a mere lender.  [Balboa Motions to Dismiss Nov. 27 and Dec. 27, 2023, Dckts. 30 and 40].

16.     The Court dismissed the two claims asserted against Balboa, with leave to amend, on February 8, 2024.  [Dckt. 51].  On April 15, 2024, after further motion practice, the Court dismissed one of the two claims asserted against Balboa with prejudice, with leave to amend concerning the other.  [Dckt. 69].

17.     In its February 2024 Order, the Court found that Dr. Aryanpure and Mitt Lary "appear to sufficiently allege" that (a) Dr. Aryanpure's consent was "obtained following fraudulent representations made by Third-Party Defendant [Cynosure]," and (b) a relationship with Cynosure existed "to establish liability for any misrepresentations made . . . ."  [Dckt. 69 at 9].

18.     Cynosure moved to have the claims against it transferred to Massachusetts, in reliance upon a forum selection clause in the purchase agreement.  [Dckt. 58]. Dr. Aryanpure and

Mitt Lary subsequently stipulated to this change of venue [Dckt. 70] and the case was transferred on April 30, 2024.  [Dckt. 74].

19.    On May 3, 2024, the U.S.D.C. for the District of Massachusetts (Boston) (Casper, J.) allowed Cynosure's Assented-To Motion to extend the time to respond to Dr. Aryanpure's Third-Party Complaint.  [Dckt. 80].

20.    On May 29, 2024, DeMoura|Smith LLP entered appearances on behalf of Dr. Aryanpure and Mitt Lary. [Dckts. 84 and 85].

21.    On May 30, 2024, Cynosure filed an assented to Motion to Enlarge the time to respond to the claims asserted by Dr. Aryanpure and Mitt Lary, based upon an agreement that Cynosure would have additional time to respond after newly-entered Massachusetts counsel filed this Amended Third-Party Complaint.  [Dckt. 86].  Cynosure's Motion was allowed on May 31, 2024.  [Dckt. 87].

**Factual Statement Relevant to All Claims**

22.    Cynosure develops, manufactures, markets, and distributes "energy" or "light" emitting devices for various medical and cosmetic applications, including for "non-invasive body-contouring, hair removal, skin revitalization, and women's health."

23.    In February 2017, Cynosure (then known as Cynosure, Inc.) was acquired by Hologic, Inc., in a $1.65 billion equity purchase.  Hologic is an established and well-known developer and manufacturer of medical technology, primarily focused on women's health. Upon closing, Cynosure, Inc., became a wholly owned subsidiary of Hologic.

24.    Just over one year later, in May 2018, Hologic announced that it was necessary to decrease Cynosure's value on its books by nearly one half, or $732 million.

25.    One of Cynosure's products is its "TempSure RF Platform."  The device consists of a "TempSure RF (for radiofrequency) Generator," pictured below, with various separately available attachments.



*Cynosure's "TempSure RF Generator"*

26.    Radiofrequency has been applied for technological purposes, including medical applications, since the early 1900s.  Today, its uses range from radios and radar to garage door openers and mobile phones.[1]

27.    Cynosure claims that TempSure's radio waves, applied at a sufficient strength, cause disturbances at the cellular level that result in, among other things, increased blood flow, tissue repair, and the production of collagen and elastin.

28.    TempSure's add-on applications are plugged into the generator through a cord, at the end of which is fixed a tool that purports to deliver the desired application.

---

[1] O'Connor JL, Bloom DA. William, "T. Bovie and electrosurgery" Surgery, 1996 Apr;119(4): 390–6; for a general description of the technology, see Jessica Scarpati, "What is radio frequency (RF)?" *SearchNetworking*, accessed 17 July 2024.

29.     One of these attached applications is called "Vitalia," which Cynosure described as "specifically designed for a woman's genitalia" to provide a "solution" to patients who have experienced "changes in their vaginal health over time."

30.     In a July 2018 statement, Cynosure described Vitalia as an "FDA-cleared" treatment that "delivers therapeutic heat to internal and vaginal tissue to improve circulation."

31.     A second attachment is called "Envi," which Cynosure describes as a "device for minimizing facial lines and wrinkles" and "improving the appearance of cellulite."



*A TempSure RF Generator with attachments*

32.     Contrary to Cynosure's claims, the FDA has never "cleared" the TempSure device, nor Cynosure's related laser-based technology, for "vaginal rejuvenation."  In fact, it does not even appear that Cynosure has ever even *applied* for such clearance.

33.     On July 24, 2018, the FDA wrote to Cynosure about its concerns, flatly stating that it had no record of Cynosure having obtained FDA clearance or approval for its related laser devices as a "simple, safe, and clinically proven laser treatment for the painful symptoms of

menopause, including intimacy," or otherwise shown that the device "delivers gentle, virtually painless laser energy" that "stimulates cells that are important in creating fluid . . . ."

34.     The FDA directed Cynosure to provide evidence that the device had been cleared for these purposes, or to otherwise explain why no such clearance was required.[2]

35.     Six days later, on July 30, 2018, FDA Commissioner Scott Gottlieb issued an even harsher criticism to the industry at large.[3]  Gottlieb began his public comment by reiterating that one of the FDA's fundamental obligations was to protect the public from "harmful products" and "deceptive medical claims."  As part of obligation, the FDA found it necessary to address "bad actors" who "unfortunately take advantage of unsuspecting consumers by marketing unapproved" and "deceptive" products.

36.     Commissioner Gottlieb continued that that the FDA had

> recently become aware of a growing number of manufacturers marketing "vaginal rejuvenation" devices to women and claiming these procedures will treat conditions and symptoms related to menopause, urinary incontinence or sexual function. The procedures use lasers **and other energy-based devices** to destroy or reshape vaginal tissue. These products have **serious risks** and **don't have adequate evidence** to support their use for these purposes. We are **deeply concerned** women are being harmed.
>
> As part of our efforts to promote women's health, the FDA has cleared or approved laser and **energy-based devices** for the treatment of serious conditions like the destruction of abnormal or pre-cancerous cervical or vaginal tissue, as well as condylomas (genital warts). **But the safety and effectiveness of these devices**

---

[2] *See, e.g.,* Letter from CDR Cesar A. Perez, PhD, Chief, Surveillance and Enf't Branch I, Div. of Premarket and Labeling Compliance, Ctr. for Devices and Radiological Health, to Connie Hoy, Official Correspondent, Cynosure, Inc., FDA (July 24, 2018), https://www.fda.gov/files/medical%20devices/published/Cynosure--Inc.-Letter---July-24--2018.pdf.
[3] Press Release, Statement from FDA Commissioner Scott Gottlieb, M.D., on efforts to safeguard women's health from deceptive health claims and significant risks related to devices marketed for use in medical procedures for "vaginal rejuvenation," FDA (July 30, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-efforts-safeguard-womens-health-deceptive-health-claims ("July 2018 FDA Warning").

<u>**hasn't been evaluated or confirmed by the FDA for "vaginal rejuvenation.**</u> (emphasis added)[4]

37.     Commissioner Gottlieb found this behavior to be "egregious" and expressed concern that the "deceptive marketing of unproven treatments" would prevent affected patients from accessing "appropriate, recognized therapies."[5]

38.     In August 2018, Cynosure acknowledged that the FDA's concerns squarely applied to its TempSure product, took it off the market, and issued a recall of those devices already sold.

39.     Just four months later, however, in December 2018, Cynosure turned 180 degrees and "relaunched" Vitalia for the exact same gynecological applications.  Cynosure justified its decision by asserting that it "remain[ed] committed to advancing women's pelvic health around the globe."[6]  Cynosure claimed that, after the FDA's July 2018 admonishment, it had "reviewed and updated" its "marketing and promotional materials" to make them "consistent" with FDA "expectations."

40.     This is pure doublespeak.  Whatever "updates" took place, Cynosure unabashedly returned to the very same marketing practices that the FDA had warned about in the first place. The TempSure Vitalia was again pitched as a "simple," "gentle," and "non-invasive rejuvenation" process that would improve "sexual well-being."  A quick and painless touch from this magic wand would "spice things up" in the bedroom, address "the effects of aging" that cause "negative changes . . . down there," and "treat urinary and incontinence problems" to boot.

---

[4] *Id.*
[5] *Id.*
[6] Press Release, Hologic's Cynosure Division Launches TempSure™ Surgical RF Technology in North America, Hologic, Inc. (December 13, 2018), https://investors.hologic.com/press-releases/press-release-details/2018/Hologics-Cynosure-Division-Launches-TempSure-Surgical-RF-Technology-in-North-America/default.aspx.



April 2020 Cynosure advertisement for TempSure Vitalia

41.     The FDA has never retracted its July 2018 admonishments.

42.     The process under which Cynosure obtains clearance for TempSure, a fast-tracking program known as 510(k), is not an "approval" in the way the FDA approves medications as safe for consumption, but is instead essentially a mechanism for Cynosure to register its devices.

43.     Furthermore, it appears that Cynosure has repeatedly claimed that premarket approval for applications of its "revolutionary" radiofrequency technology is <u>not needed,</u> because the relevant technology – heating tissue with radio waves – is sufficiently similar to devices that have been "marketed in interstate commerce prior to May 28, 1976."[7]   In other words, FDA clearance is not needed for technology that has been in use since the 1920s.

44.     In any event, as of the date of filing, it does not appear that the FDA has <u>ever</u> cleared or approved <u>any</u> energy-based medical device, including Cynosure's TempSure, for vaginal "rejuvenation" or to treat vaginal symptoms such as urinary incontinence or sexual dysfunction.

---

[7] *See, e.g.,* Letter from Binita S. Ashar, M.D., M.B.A., F.A.C.S., Dir., Div. of Surgical Devices, Office of Device Evaluation, Ctr. for Devices and Radiological Health, to Amy Tannenbaum, Regulatory Affairs Specialist, Cynosure, Inc., FDA (September 22, 2017), https://www.accessdata.fda.gov/cdrh_docs/pdf17/K171262.pdf.

45.    To this day, the American College of Obstetricians and Gynecologists ("ACOG") continues to warn against the use of these types of devices for these purposes, and considers the marketing of these devices for "vaginal rejuvenation" to be "deceptive."

46.    In 2018, Cynosure hired a self-described "bigger" and "better" sales force, which fanned out across the country to aggressively peddle the company's products.

47.    Upon information and belief, Cynosure sales representatives made cold calls to health practitioners throughout their designated regions.

48.    One such sales agent was Cassandra Whipple ("Whipple"), who operated out of Atlanta, Georgia, and, upon information and belief, made cold calls throughout Georgia and Alabama.

49.    Upon information and belief, when health care providers would answer the phone, Whipple represented herself as being from "Hologic" and would tell each target that they, alone, had been "specially selected" to benefit from an exclusive and limited-time business offer.

50.    Whipple's spiel was that the target had been chosen because of their strong reputation, and because a study of demographics demonstrated that they were "uniquely positioned" to benefit from a particular Cynosure's product.  But the target had to act "quickly" because sales in the region would be limited, and because there was another potential target just waiting in the wings who would be acting quickly if the target did not.

51.    These sales tactics were meant to create the false impression that Cynosure was willing to limit sales within a region in order to protect the target from competition, and to pressure the target into acting *immediately* or else risk missing out on a limited opportunity.

52.     Whipple contacted Mitt Lary in July 2019, and befriended Mitt Lary's front office staff.  Through that relationship, Whipple was able to secure a lunch meeting at Mitt Lary with Dr. Aryanpure and her staff.

53.     Whipple's sales tactics were on-script and unrelenting.  She told Aryanpure that her practice had been specifically chosen from numerous other possible targets in the region because of the doctor's "reputation," and because her practice was "uniquely positioned" to benefit from Cynosure's technology.  Cynosure had made this determination after a careful study of the area's "demographics," patient traffic, and, in particular, the nature of Dr. Aryanpure's clientele and practice.

54.     Whipple represented that based upon Cynosure's analysis, the TempSure device would help Mitt Lary grow its business by "up to 20 to 30 patients per month."

55.     Dr. Aryanpure was being offered a "one-time promotion" that was time-constrained.  Whipple explained that another local medical practice had also been identified that, although not quite as good of a fit as Dr. Aryanpure, would almost certainly take advantage of the opportunity if Dr. Aryanpure did not.

56.     Whipple said that if Dr. Aryanpure acted, Cynosure would not be selling more than one of these units locally, such that she would be protected from competition from others.

57.     Whipple declared that no other practitioner within fifty miles had anything like what was being offered.

58.     None of this was true.  Cynosure had not conducted any studies that identified Mitt Lary as a "unique" target.  Dr. Aryanpure had not been specially selected.  There was no time-constrained promotion. There was no back-up candidate waiting in the wings.

59.     And, upon information and belief, Cynosure sold as many units as it could throughout the country, and cared not one whit about protecting individual buyers from market saturation.

60.     Believing these various representations to be true, Dr. Aryanpure expressed an interest in the product.  The misrepresentations continued.

61.     Whipple said that Cynosure was "small," but was backed by its well-known parent, Hologic.

62.     Everything was "Hologic, Hologic, Hologic," Dr. Aryanpure and her staff have recounted.  "If you fail, Hologic fails," Whipple told the doctor.

63.     This was also not true, as Hologic was at the time distancing itself from Cynosure. Within four months, Hologic would dump Cynosure for just $205 million, taking a loss of more than $1.4 billion off the purchase price from just two years earlier. Hologic had learned, as Dr. Aryanpure would eventually learn, that Cynosure's products and promises were shams.

64.     To demonstrate Hologic's purported commitment, Whipple told Dr. Aryanpure that she was going to put her in touch with one Mike Russo, whom she represented as being with "Hologic Corporate."  Russo would verify Hologic's strong backing for the product.

65.     Russo was, in fact, another member of Cynosure's sales team.

66.     Whipple described TempSure's attributes in almost mythical terms.  The "non-invasive" application "painlessly" delivers results to customers, who would come in droves to take advantage of its "revolutionary technology."

67.     But the device was neither painless nor "non-invasive." It required vaginal penetration by an attached "wand," which utilized aggressive heating to achieve its supposed beneficial results.

68.     Nor was the technology "revolutionary."  As noted above, Cynosure repeatedly obtained FDA "clearance" for generic uses (unrelated to "vaginal rejuvenation") by insisting that TempSure's radiofrequency technology was "substantially equivalent" to technology that had been on the market for decades."[8]

69.     Whipple described TempSure as using a "natural process" to achieve its results, without "injections," "invasive surgery," or "pulling and tugging on the skin."  No anesthesia was necessary because the device operated "without causing even mild discomfort."

70.     Whipple preyed upon Dr. Aryanpure's personal commitment to her profession, convincing her that she would be able to provide much needed treatment to her female clientele, many of whom were developing gynecological concerns as a result of the natural consequences of aging or as a side effect of cancer treatments.

71.     The strongest selling point for Dr. Aryanpure was Vitalia's supposed ability to achieve "vaginal rejuvenation."  In a single treatment session lasting as little fifteen minutes, the doctor was told, the device could be applied to make the vulva "more attractive,"  to tighten stretched vaginal muscles, to reinvigorate vaginal lubrication, and to cure urinary incontinence.

72.     Whipple represented that the device had already been FDA "cleared" for these purposes, and that formal approval was "expected soon."  This was a particularly egregious misrepresentation.

73.     Whipple sought to justify the device's hefty $180,000 price tag with a number of further promises.

---

[8] *See, e.g.,* Long Chen, Ph.D., Assistant Dir., Office of Prod. Evaluation and Quality, Ctr. for Devices and Radiological Health., to Kevin O'Connell, Dir. of Regulatory Affairs, Cynosure, LLC, FDA (March 25, 2020), https://www.accessdata.fda.gov/cdrh_docs/pdf20/K200241.pdf.

74. She told the doctor that she was "getting much more" than just the device. With Hologic's backing and lead, Cynosure would provide an intense and targeted marketing campaign that would drive clients to the doctor's offices.

75. Whipple promised that Mitt Lary would be assigned a "dedicated success manager" from Hologic/Cynosure, who would lead the marketing effort and otherwise respond to Mitt Lary's needs relative to the TempSure device.

76. Whipple reiterated these promises in writing, emailing on July 23, 2019: "You're in a good place as far as support too. Really insane place because you become pumped by the largest women's health care company in the world. You're good." Putting aside whether Whipple was working at an "insane place," Hologic was not then, and is not now, the "largest women's health care company in the world."

77. Whipple explained that Hologic/Cynosure would be upgrading Mitt Lary's website, and would use "SEO technology" to ensure that Mitt Lary would appear first when prospective patients were looking for care of *any* kind.

78. Whipple explained that some new patients would discover Mitt Lary because of the TempSure treatments available, but would then discover the practice's other offerings. New patients would be coming in droves.

79. These marketing and practice "makeover" guarantees were important aspects of the deal for Dr. Aryanpure.

80. Although Cynosure was charging more than $180,000 for the device, Whipple said Cynosure would make "very favorable financing" available to her. It was Cynosure's experience that customers would pay up to $900 for a single session, such that the device was guaranteed to "pay for itself."

81.    Whipple said that Hologic and Cynosure were so confident that Dr. Aryanpure would be satisfied with their product, Dr. Aryanpure would be allowed to cancel the financing and return the device at "any time" after purchase if she were not satisfied.

82.    Whipple also represented that Cynosure would provide intensive training to Mitt Lary's medical staff on the use of the TempSure device and its attachments, including as related to vaginal rejuvenation.

83.    Cynosure did not have the capability to deliver on any of these targeted marketing, training, or service promises, and new these promises to be false when made.

84.    Critically, Whipple promised that Mitt Lary would be the only practice "within fifty miles" using TempSure technology.  If she acted quickly and purchased, Cynosure would not sell to others within that area, for the purpose of ensuring that she would face zero competition going forward.

85.    Within days of their first meeting, Whipple came to Mitt Lary's offices with a "Customer Purchase Agreement" and an "Equipment Financing Agreement."

86.    Whipple presented the purchase and financing agreements as one, disguising the fact that financing was being provided by a third-party lender.  She again assured Dr. Aryanpure that she could return the device and cancel the Financing Agreement at any time. Dr. Aryanpure was encouraged to sign, and did so.

87.    The Financing Agreement contained fine print that is so small that it is nearly impossible to read without a magnifying glass.

88.    Upon information and belief, the Financing Agreement did not contain all relevant terms and conditions of the loan, including a high interest rate, a kick-back commission, the recapitalization of interest as principal, and excessively punitive terms for delayed payment.

89.    Dr. Aryanpure was required to make six monthly payments of $99.00, followed by 60 monthly payments of $4,205.50, and to personally guarantee the debt.  Although the equipment was to be delivered later, Dr. Aryanpure's payment schedule began immediately.

90.    Regardless of whether Dr. Aryanpure would be able to return the device if it did not deliver as promised, the financing agreement did not allow for the *loan* to be cancelled at any time, for any reason.  In fact, Dr. Aryanpure was obligated to continue paying through termination even if the device was defective, dangerous, inoperable, completely ineffective, or, in fact, never even delivered.

91.    Dr. Aryanpure was charged $185,027.50 for the purchase, which was to include (a) the "TempSure RF Generator," (b) the "Envi face and body application," (c) the "Vitalia small area treatment application," (d) a "Practice Transformation FTM Program," (e) a $20,000 "marketing grant," (f) a designated customer success manager, (g) an "AMPS Digital Marketing Program," and (h) a "Comprehensive Papient [sic] Pop Practice Makeover."

92.    The device was delivered on Friday, August 2, 2019.  Cynosure scheduled an "all-day" training session for a Sunday, August 4, 2019.

93.    A Cynosure representative began the training session on that day.

94.    The Cynosure representative determined that one of attachments was inoperable.

95.    The Cynosure representative then declared that the entire machine was inoperable, reportedly due to an error she had made during start up, causing the machine to malfunction.  She determined that the device would have to be returned to Cynosure for repair.

96.    The representative then left, and Cynosure did not provide any further training that day.

97.    Cynosure took the device back because it would not work. Yet Dr. Aryanpure still had to pay for it.

98.    Dr. Aryanpure began to have deep misgivings about the device, Whipple, Cynosure, and the promises that had been made.  She contacted Whipple, who said that she was unable to help and referred her back to Mike Russo.

99.    On Monday, August 5, 2019, the day after her machine failed and training was cancelled, Dr. Aryanpure spoke to Russo.  She told him in no uncertain terms that she was dissatisfied with the device, the lack of training, and a general lack of professionalism.  She insisted that Cynosure keep the broken instrument and refund her money, as had been agreed.

100.    Russo did not offer to do so, and instead begged her to keep the device, once repaired.  Russo profusely for the failures in the device and related services, and told Dr. Aryanpure that if she would agree to accept delivery nonetheless, Cynosure would make it up to her, both by (a) extending the device's warranty to five years and (b) compensating her with a specified number of disposable covers for the Envi and Vitalia attachments.

101.    During  the call, Russo promised to email these additional terms in writing to Dr. Aryanpure.

102.    Russo did not send the promised email.

103.    When Dr. Aryanpure again wrote to Whipple to say that her issues remained unaddressed, Whipple now responded that because she was such an important client, the "Director of Technology" was going to call her.  He would answer "all science questions" because he had "designed some of the biggest things in our space."

104.    No such individual ever called.

105.    Cynosure never sent the parts and accessories promised by Russo.

106.    The same Cynosure training representative eventually returned to Mitt Lary to help with the set-up of a loaner device.  But the representative could spare only one hour with Dr. Aryanpure and her staff, and could not provide the promised day-long training session because she had "other obligations."

107.    Dr. Aryanpure and her staff described the representative's behavior during this second visit as being curt and bordering on disagreeable.

108.    Mitt Lary was constrained in its ability to use the loaner device because training had still not been provided.

109.    On September 9, 2019, Cynosure delivered the repaired device to Mitt Lary, and the loaner was returned.  As of this date, training had still not been provided.

110.    Cynosure delivered a TempSure "Clinical Reference Guide" describing the use of the machine.  <u>The document neither mentions nor provides instructions for any aspect of "vaginal rejuvenation."</u>

111.    Mitt Lary never received the full day training session.

112.    Mitt Lary was never provided with training for "vaginal rejuvenation," or on any other supposed gynecological applications of the Vitalia device.

113.    When Dr. Aryanpure protested to Whipple about the need for training, Whipple suggested she look on "Instagram" where she could "find some useful videos."

114.    On September 9, 2019, Dr. Aryanpure wrote to Whipple as follows:

> I am extremely disappointed in your company, seems like once contract was signed, y'all left us in [the] dark, As of today nothing has been done , I was under the impression y'all [were] helping with marketing and getting started! Dede was supposed to come but canceled on us last minute and didn't reschedule. Your boss Russ won't return calls. I am pissed at myself for falling for your sales pitch.

115.    Whipple responded that she was also "in the dark" about these problems.

21

116.    On that same day, September 9, Mitt Lary's office administrator wrote to Cynosure about the lack of follow-up on the promises that Mike Russo had made during his September 5, 2019, call.  Cynosure provided no response.

117.    On September 11, 2019, Cynosure posted an advertisement about the "TempSure Envi" on Mitt Lary's Facebook page in which Cynosure represented that the device would "gently heat the skin" yet cause "no discomfort or pain."

118.    On October 3, 2019, Cynosure sent a promotional agent, Daphne Long, to conduct a TempSure launch party at Mitt Lary, billed as a "VIP Friends and Colleagues Event."

119.    Ms. Long showed little interest in promoting the TempSure device, or in interacting with Mitt Lary's clientele.

120.    Dr. Aryanpure learned that Ms. Long soon after left the company.

121.    Still without proper training, Dr. Aryanpure continued to call Russo and also her designated account manager about her problems.  Those calls were not returned.

122.    Dr. Aryanpure then wrote to Whipple about this lack of response (on October 24 and 30, 2019).  Dr. Aryanpure again expressed her deep frustration, writing that "you made me a lot of promises and thus far I have had nothing but disappointment."

123.    In response, Whipple explained that the account manager was not returning Dr. Aryanpure's calls because she had left the company.  Whipple said that the company was "doing some rearranging."  Whipple provided the name of yet another individual, and, without providing an introduction, told Dr. Aryanpure to call and  "introduce yourself."

124.    Hologic was at this time in the process of selling Cynosure to a third-party at an enormous loss.

125.    Cynosure still did not provide the promised training, did not follow up on Russo's promises, and was generally non-responsive to Dr. Aryanpure and her staff.

126.    Mitt Lary attempted to use the Vitalia device on a test basis to achieve "vaginal rejuvenation." The test patient complained of intense pain when the device was used, and the treatment was aborted.

127.    On November 13, 2019, Dr. Aryanpure wrote to Whipple and again reiterated that "you and your company made false claims and promises." Aryanpure continued that she and her staff remained unable to "even get hold of any our contacts that you promised would be available to help and guide us."

128.    On or about November 15, 2019, Dr. Aryanpure finally spoke with a new account manager. Despite this call, Cynosure took no action to address Dr. Aryanpure's concerns.

129.    Cynosure continued to spam Mitt Lary's Facebook page with generic advertisements. On November 19, 2019, Cynosure posted an advertisement for the TempSure Vitalia attachment, calling it the "only true" temperature-controlled radiofrequency probe for "women's wellness," which could be used to "get started" on "revitalizing your intimate area."

130.    The next day, November 20, 2019, Hologic formally announced that it was cutting ties with Cynosure because the company had "significantly underperformed our expectations."

131.    No one at Cynosure mentioned this development to Dr. Aryanpure or the staff at Mitt Lary.

132.    On November 22, 2019, Dr. Aryanpure wrote to Whipple and reiterated that "you guys definitively don't live up to your words," but had instead made "empty promises." Aryanpure wrote that she "would like to end this whole ordeal without litigation" and that she "need[ed] to get rid of [the TempSure device] ASAP."

133.    Whipple did not respond, then or ever regarding the TempSure device, and she too left the company a short time later.

134.    Three months later, in February 2020, Whipple did write to Dr. Aryanpure, but was now working with a new company. She sought to pitch another product to Dr. Aryanpure, promising that her new employer could actually achieve "everything that Cynosure was suppose[d] to do," but did not.

135.    Cynosure's promised "targeted marketing campaign" never materialized, and the generic posts that Cynosure uploaded onto Mitt Lary's Facebook page drew virtually no comment, and no customers. Cynosure did not redesign Mitt Lary's webpage, as had been promised.

136.    Dr. Aryanpure soon determined that the regional exclusivity that she had been promised was also a farce. Traveling to a regional trade show in nearby Birmingham, Alabama, she saw that numerous other locally-operating practitioners were offering the same technology. As of the date of this filing, there are numerous other practitioners within fifty miles who are listed as having purchased the TempSure device, or similar applications, from Cynosure.

137.    Despite Cynosure's failure to provide proper training, failure to deliver promised parts, failure to provide the promised "targeted" marketing, and despite numerous unexpected problems with using the device itself, Mitt Lary initially rendered the monthly payments to the lender, Balboa Corporation.

138.    In the end, hardly any patients sought out Mitt Lary's practice for this treatment. This was not surprising, as Mitt Lary's small practice focused on family care. Individuals seeking cosmetic skin treatment were naturally drawn to practices dedicated to providing such services. The TempSure device was never, and could never, be a fit for Mitt Lary's practice, Cynosure's misleading representations about targeted analysis of "demographics" notwithstanding.

24

139.    In early 2020, the State of Alabama imposed Covid restrictions and lockdowns on businesses.  To protect the health and safety of its patients and employees, Mitt Lary treated patients from its parking lot.

140.    Mitt Lary sought to pause payments on the TempSure device.

141.    The lender, Balboa, would not agree, and in May 2020 commenced a collection action against Mitt Lary in California state court.  Balboa aggressively pursued recovery, with interest and penalties.

142.    On information and belief, this was one of scores of such collection lawsuits.

143.    Mitt Lary eventually paid lender Balboa $360,000 under the abusive terms of the financing Agreement.

## COUNT I
### Breach of Contract

144.    Third-Party Plaintiffs reallege and incorporate the foregoing factual allegations common to all claims.

145.    Mitt Lary and Cynosure entered into a valid and enforceable contract whereby Mitt Lary agreed to purchase the TempSure device.  Cynosure made numerous contractual promises in return, which it failed to perform.

146.    As described in considerable detail above, Cynosure materially breached its obligations under the Agreement in numerous ways, including as follows:

a.    Cynosure represented that the device would deliver "pain free" treatment.  It did not.

b.    Cynosure represented that the Vitalia application was effective for vaginal rejuvenation.  It was not.

c.    Cynosure represented that the Vitalia application was "non-invasive."  It was not.

d.      Cynosure asserted that the FDA had "cleared" the device for the purpose of "vaginal rejuvenation."  It had not.

e.      Cynosure agreed to deliver a "Practice Transformation FTM Program."  It failed to do so.

f.      Cynosure agreed that the purchase included a $20,000 "marketing grant."  No such marketing was ever carried out.

g.      Cynosure agreed to provide a designated Customer Success Manager.  No such designated Customer Success Manner provided sustained or reliable assistance.

h.      Cynosure agreed to provide an "AMPS Digital Marketing Program."  No such program was provided.

i.      Cynosure agreed to provide a "Comprehensive Papient [sic] Pop Practice Makeover."  No such patient makeover was provided.

j.      Cynosure represented that the device could be returned at any time, but then refused to honor that commitment.

k.      Cynosure agreed to extend the warranty by five years, and provide additional parts in supplies, if Dr. Aryanpure would agree to accept the broken device once repaired, but then refused to honor that agreement.

l.      Cynosure represented that Dr. Aryanpure would face no competition from similar technology within a fifty-mile radius, but engaged in sales to other practitioners within that region.

147.    Cynosure received full payment for the purchase price of the device, and Mitt Lary fully performed this and all other obligations pursuant to the Agreement.

148.    As a direct and proximate result of Cynosure's breaches, Mitt Lary has suffered and continues to suffer damages.

## COUNT II
### Breach of Implied Covenant of Good Faith and Fair Dealing

149.    Third-Party Plaintiffs reallege and incorporate the foregoing factual allegations common to all claims.

150.    To ensure that contracting parties "remain faithful to the[ir] intended and agreed expectations," every Massachusetts contract contains an implied covenant of good faith and fair dealing."  *See Uno Rests., Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). Contracting parties may not remove or modify the covenant, and a contract's implied covenant can be breached even where its express terms are not -- the implied covenant would otherwise be a mere redundancy.  S*ee Fortune v. National Cash Register Co.*, 373 Mass. 96, 101, 105 (1977); *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005).

151.    The implied covenant is breached where a defendant's course of performance has the effect of "destroying or injuring" a plaintiff's expected "fruits of the contract."  *FabriClear, LLC v. Harvest Direct, LLC*, 481 F. Supp. 3d 27, 35 (D. Mass. Aug. 24, 2020); *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 570 (2010).

152.    As set forth in the foregoing claim, Cynosure's course of performance breached the Agreement's <u>express</u> terms.

153.    Cynosure's course of performance also breached the Agreement's <u>implied</u> covenant of good faith and fair dealing, because Cynosure first injured, and then destroyed, Mitt Lary's expected (and promised) contractual benefits.

154.    Not only did Mitt Lary not enjoy ***any*** benefits from the Agreement, but Dr. Aryanpure in fact <u>lost</u> more than $360,000 in paying for a defective machine that <u>never</u> did (<u>nor ever could</u>) perform the promised "vaginal rejuvenation."

155.    Even if the device *could have performed* as promised, and some benefits otherwise *could have been realized*, Cynosure's course of performance ensured that this did not happen.

156.    Cynosure's offending actions are set forth in detail above, and include that it (a) sold competitive products to other practitioners in close geographic proximity to Mitt Lary, diluting Mitt Lary's right to market exclusivity; (b) failed to provide requisite training, and instead told Mitt Lary to search "Instagram" to see how the applications could be used; (c) failed to provide the promised support from its supposedly committed parent company, Hologic; (d) failed to respond in a timely manner to repeated customer complaints submitted by Mitt Lary; (e) failed to consistently identify and provide a reliable point of contact for Mitt Lary at either Hologic or Cynosure; (f) failed to provide "targeted" marketing that in any way benefitted Mitt Lary; (g) failed to aid Mitt Lary in its attempts to halt payment on the device when the device failed to "pay for itself;" (h) failed to notify Mitt Lary – in advance or at any time – that Hologic was selling Cynosure at enormous loss, and thus divorcing itself from Cynosure and its offending operations; (i) failed to accept Mitt Lary's request to return the machine when it would not work upon delivery; (j) failed to extend Mitt Lary's warranty to five years or to deliver promised parts to address the device's failure to operate; and (k) continued to misrepresent TempSure Vitalia's ability to "painlessly" provide "vaginal rejuvenation."

157.    As a direct and proximate result of Cynosure's breach of the implied covenant of good faith and fair dealing, Mitt Lary has suffered and continues to suffer damages.

<u>**COUNT III**</u>
**Breach of the Implied Warranty of Merchantability and Fitness for a Particular Purpose**

158.    Third-Party Plaintiffs reallege and incorporate the foregoing factual allegations common to all claims.

159.    Cynosure is a "seller" and a "merchant" pursuant to M.G.L. c. 106, §§ 2-104(1) and 2-103(1)(d), and sold the TempSure device and attachments as "goods" within the meaning of M.G.L. c. 106, §§ 2-105(1) and 2A-103(1)(h).

160.    Cynosure warranted that the TempSure device and its attachments were in merchantable condition and fit for the ordinary purpose for which they were intended, pursuant to M.G.L. c. 106, §§ 2-314 and 2A-212.

161.    The TempSure device and its attachments were not in merchantable condition and were not fit for the purposes for which they were intended.

162.    The TempSure device was so defectively manufactured that it did not even survive its initial start-up and demonstration by a trained Cynosure specialist on Mitt Lary's premises, and instead broke down and had to be returned to Cynosure for repairs.

163.    The TempSure device contains defective warnings, including that it is described as "painless," and yet causes intense pain to users.

164.    The TempSure Vitalia device is defectively marketed because Cynosure made written and oral statements that diminished the product's quality and safety.  In particular, Cynosure's statements about Vitalia risked confusing medical practitioners and their patients into doing something that results in injury, damage, or loss.  Cynosure marketed Vitalia with pictures of blissful woman relaxing in the supposed aftermath of a Vitalia treatment that had allowed them to again "spice things up" in their bedroom.  As FDA Commissioner Gottlieb expressly found, such marketing efforts are "egregious," and created the risk that such "deceptive

marketing of unproven treatments" would prevent affected patients from accessing "appropriate, recognized therapies."

165.    The TempSure device in general, and the Vitalia attachment in particular, were also defectively designed and manufactured, in that they promised to provide "vaginal rejuvenation," when in fact there is no medical proof that the device is able to provide any of the described benefits, including tightening and making more elastic vaginal muscles, altering vaginal lubrication, or curing urinary incontinence.  Mitt Lary never successfully treated a single patient for "vaginal rejuvenation."

166.    As a direct and proximate result of Cynosure's breaches of the implied warranty of merchantability and/or fitness for a particular purpose, Mitt Lary has suffered and will continue to suffer damages.

## COUNT IV
### Promissory Estoppel

167.    Third-Party Plaintiffs reallege and incorporate the foregoing factual allegations common to all claims.

168.    As is set forth in considerable detail above, Cynosure made numerous representations to Dr. Aryanpure and Mitt Lary for the purpose of inducing them to obtain the TempSure device and sign the financing agreement.  These included promises that (a) the TempSure device could be returned at any time; (b) targeted and sustained marketing of Mitt Lary and its services would be provided; (c) extensive training would be provided; (d) territorial exclusivity would be established and preserved; (e) financing would be provided on "favorable terms;" (f) the device was guaranteed to "pay for itself;" (g) Dr. Aryanpure and Mitt Lary were uniquely qualified and appropriately chosen to benefit from the TempSure device based upon a careful study of demographics and patient traffic; (h) Cynosure's parent Hologic stood firmly in

support of Cynosure's products, and would provide close support going forward; and (i) the

Vitalia device had been FDA "cleared" for vaginal "rejuvenation" and tightening.

169.    Mitt Lary and Dr. Aryanpure acted in reasonable reliance on these promises, and

suffered enormous consequences and damages as a direct and proximate result, including the

payment of more than $360,000 (for a device that brought in less than ten customers), legal fees

and costs, and a considerable amount of time invested for no meaningful return.

**COUNT V**
**Fraud/Intentional Misrepresentation/Deceit**

170.    Third-Party Plaintiffs reallege and incorporate the foregoing factual allegations

common to all claims.

171.    As is set forth in considerable detail above, Cynosure made numerous false

statements and misleading half-truths, and concealed and omitted material information in

violation of a duty to disclose, and Cynosure intended Dr. Aryanpure and Mitt Lary to rely upon

those false statements, half-truths, and omissions in purchasing the TempSure device and

entering into the financing agreement.

172.    Cynosure's false statements and misleading half-truths included the following,

which were made during phone calls and meetings conducted, and writings sent, in July 2019,

between Cynosure's designated agent, Cassandra Whipple, and Dr. Aryanpure and her staff at

Mitt Lary:

> a.    Dr. Aryanpure and Mitt Lary had been chosen from among numerous
>       other qualified candidates to benefit from a limited-time opportunity to
>       purchase the TempSure Device.  This was untrue.
>
> b.    Cynosure had conducted "demographic" studies of the area and of Mitt
>       Lary's cliental to make this determination, and had further determined that

31

Mitt Lary was uniquely positioned to benefit from the device and the services that Cynosure would provide with it.  No such studies had been conducted.

c.     Another nearby candidate had been identified who was also qualified to benefit from the purchase of the product, but this other candidate would be prevented from making the purchase if Dr. Aryanpure and Mitt Lary acted quickly.  There was no such alternative candidate waiting in the wings.

d.     No other practitioner owned this device, or any device with similar technology, within a fifty-mile radius, and if Dr. Aryanpure and Mitt Lary purchased the device, Cynosure would ensure that this competition-free zone was maintained going forward.  This was untrue, and Cynosure had sold, and continued to sell, similar technology in close proximity to Mitt Lary's offices.

e.     Hologic would provide the full weight of its corporate support to Dr. Aryanpure and Mitt Lary, and if they failed, "Hologic fails."  These statements were made less than four months before Hologic dumped Cynosure at a loss of more than $1.4 billion.

f.     Hologic was the "largest women's health care company in the world."  This was untrue.

g.     The TempSure device and its applications had been "cleared" by the FDA.  In fact, the FDA has *never* cleared this device (or, it appears, *any* energy emitting device) for vaginal "rejuvenation" or tightening.

h.     The TempSure device delivered "pain free" treatment.  This was untrue.

i.     That the Vitalia attachment was "non-invasive."  It actually required vaginal penetration.

j.     The TempSure Vitalia attachment could provide "vaginal rejuvenation," including vaginal tightening, improved elasticity, improved elasticity, and improved lubrication.  The device was not capable of providing these results.

k.     The TempSure device could cure urinary incontinence.  The device is not capable of providing that result.

l.     Cynosure and Hologic would provide a designated "Customer Success Manager."  No such individual was available to serve this role.

m.     Cynosure and Hologic would provide continuous and extensive technical training to Mitt Lary's medical staff and employees on the operation of the TempSure device.  Cynosure and Hologic knew that they were not capable of providing this training, and did not do so.

n.     Cynosure and Hologic would closely partner with Dr. Aryanpure and Mitt Lary to provide an intense, targeted, and ongoing marketing campaign and provide business development expertise surrounding the TempSure device, which would increase client base and would revitalize Mitt Lary's business model.  Cynosure and Hologic knew that they were not capable of providing this marketing and business development expertise, and did not do so.

o.    Cynosure would make financing available on favorable terms. Cynosure was fully aware that the financing to be provided was oppressive, its actual nature disguised behind fine print and hidden terms.

p.    The TempSure device could be returned to Cynosure at any time, so confident was Cynosure that Dr. Aryanpure and Mitt Lary would benefit from the device and the accompanying services. Cynosure knew, but Mitt Lary and Dr. Aryanpure did not, that Cynosure would have no control over the lender's actions relative to the financing agreement, that Cynosure had no authority to make any promises relative to the financing agreement, and that any such promises were false.

q.    The device would "pay for itself." Cynosure knew that this was untrue, based upon the struggles of hundreds of other similarly situated practitioners that had purchased this or similar devices from the company.

173.    Cynosure's concealment of material information included the following:

a.    Cynosure concealed that the FDA had warned the company in July 2018 that there was no record of the company having obtained FDA clearance or approval for its related laser devices as a "simple, safe, and clinically proven laser treatment for the painful symptoms of menopause, including intimacy," or otherwise shown that the device "delivers gentle, virtually painless laser energy" that "stimulates cells that are important in creating fluid . . . ."

b.    Cynosure concealed that the FDA had also, in July 2018, labeled Cynosure and others marketing these devices as "bad actors" who

"unfortunately take advantage of unsuspecting consumers by marketing

unapproved" and "deceptive" products.

c.    Cynosure concealed that the FDA had also identified devices such as

TempSure as having "serious risks" that were without "adequate evidence

to support their use" for "vaginal rejuvenation" or "sexual function."

d.    Cynosure concealed the fact that it had, in response to the FDA's

warnings, pulled the Vitalia device from the market and recalled all

devices sold in response, only to return it to the market without addressing

the FDA's concerns.

174.    These false statements, half-truths, and omissions were related to matters that

were **<u>critical</u>** to Dr. Aryanpure's and Mitt Lary's decision to purchase the TempSure device, and

Mitt Lary and Dr. Aryanpure would not have moved forward had they known that they were

being deceived.

175.    Whipple and Cynosure intended Dr. Aryanpure and Mitt Lary to rely upon these

false statements, half-truths, and omissions when they were deciding to purchase the TempSure

device and enter into (and personally guarantee) the financing agreement.

176.    Dr. Aryanpure and Mitt Lary reasonably relied upon Cynosure's false statements,

half-truths, and omissions.

177.    By relying upon Cynosure's false statements, half-truths, and omissions, Dr.

Aryanpure and Mitt Lary have suffered considerable loss, harm, and damages, including more

than $360,000 paid for the device, the accrual of enormous legal fees in defending against claims

related to the device, and the loss of enormous amounts of time trying to make the TempSure

device fit within their practice.

## COUNT VI
### Negligent Misrepresentation

178.    Third-Party Plaintiffs reallege and incorporate the foregoing factual allegations common to all claims.

179.    During the course of their business, Cynosure and Whipple supplied false information in statements, half-truths, and omissions without exercising reasonable care or competence in obtaining or communicating that information.

180.    This information was provided for the guidance of Mitt Lary and Dr. Aryanpure in their business transactions, namely, for the purpose of purchasing the TempSure device and entering into (and personally guaranteeing) the finance agreement.

181.    As was set forth above, Mitt Lary and Dr. Aryanpure reasonably and justifiably relied upon this information, and were unaware that it was false.

182.    By relying upon Cynosure's false statements, half-truths, and omissions, Dr. Aryanpure and Mitt Lary have suffered considerable loss, harm, and damages, including more than $360,000 paid for the device, the accrual of enormous legal fees in defending against claims related to the device, and loss of enormous amounts of time trying to make the TempSure device fit within their practice.

## COUNT VII
### Violations of M.G.L. c. 93A §§ 2, 11

183.    Third-Party Plaintiffs reallege and incorporate the foregoing factual allegations common to all claims.

184.    Cynosure and Mitt Lary are engaged in trade or commerce.

185.    Cynosure's misleading and deceitful acts, omissions, and misrepresentations of fact, as set forth in considerable detail in the foregoing paragraphs, were intended to induce Mitt Lary to purchase the TempSure device and take on the obligations of the financing agreement.

186.    Those acts, omissions, and misrepresentations were performed willfully and knowingly and plainly constitute unfair and deceptive acts and practices, made unlawful pursuant to M.G.L. c. 93A, §2.

187.    The core of Cynosure's deceptive trade practices originated in or were conducted in Massachusetts.  Cynosure's purchase documents state that the purchase, and claims under it, are governed by Massachusetts law.  The company is headquartered in Massachusetts and conducts its business from there.  Among its many other acts and omissions emanating from Massachusetts, Cynosure decided to market the TempSure device for "vaginal rejuvenation," despite an FDA warning, delivered to Cynosure's Massachusetts offices, that it should not do so.  Upon information and belief, Cynosure's sales agents, including Whipple, received their training and direction from Massachusetts, including a script of misrepresentations to make.  Cynosure's fraudulent representations about its close alignment with Hologic, also a Massachusetts company, were made from Massachusetts.

188.    As a direct and proximate result of Cynosure's unfair or deceptive acts or practices, Mitt Lary has suffered and continues to suffer damages.

## COUNT VIII
### Unjust Enrichment

189.    Third-Party Plaintiffs reallege and incorporate the foregoing factual allegations common to all claims.

190.    Mitt Lary and Dr. Aryanpure conferred a valuable benefit to Cynosure by entering into the finance agreement, which resulted in Cynosure immediately receiving full payment for the TempSure device.

191.    Cynosure knew of this benefit, retained payment, and should have reasonably expected to compensate Mitt Lary and Dr. Aryanpure in return, including by accepting return of the TempSure device and refunding payment.

192.    Cynosure has been unjustly enriched at Dr. Aryanpure's and Mitt Lary's expense.

## PRAYER FOR RELIEF

**WHEREFORE**, Third-Party Plaintiffs Malika Aryanpure, MD, and Mitt Lary Family Practice, LLC, respectfully request that this Honorable Court:

1.    Enter Judgment in Third-Party Plaintiffs' favor and against Third-Party Defendant on all Counts of this Complaint;

2.    Award Third-Party Plaintiffs all damages, including all compensatory and punitive damages suffered as a result of Third-Party Defendant's conduct, plus interest, attorneys' fees, and costs;

3.    Award Third-Party Plaintiffs multiple damages, attorney's fees, and costs in accordance with Mass. Gen. Laws Ch. 93A; and

4.    Grant such other further relief as may be just and appropriate.

## DEMAND FOR JURY TRIAL

**The Third-Party Plaintiffs hereby demand a Jury Trial on all issues so triable.**

**Date:  August 16, 2024**

Respectfully submitted,
THIRD-PARTY PLAINTIFFS, MALIKA
ARYANPURE, MD, & MITT LARY FAMILY
PRACTICE, LLC
By their attorneys,

/s/ *Paul M. Robertson*

Paul M. Robertson, BBO# 562421
Melanie J. McCauley, BBO # 703689
DeMoura|Smith LLP
607 North Avenue, Suite F
Wakefield, MA 01880
Tel: (781) 914-3777
Fax: (781) 914-3780
probertson@demourasmith.com
mmccauley@demourasmith.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was filed and served electronically upon all counsel of record via the Court's ECF system on the date set forth above.

/s/ *Melanie J. McCauley*

Melanie J. McCauley